JARED S. PETTINATO, MT Bar No. 7434
The Pettinato Firm
1802 Vernon St. NW, PMB 620
Washington, DC 20009
(406) 314-3247
Jared@JaredPettinato.com
Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN, and | Case No. _____ |
| COUNCIL ON WILDLIFE AND FISH, | |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| KATHARINE HAMMOND, In her official capacity as Intermountain Regional Director, National Park Service; | |
| DAVID ROEMER, In his official capacity as Superintendent of Glacier National Park; | |
| MARTHA WILLIAMS, In her official capacity as Director, U.S. Fish and Wildlife Service; | |
| THE U.S. FISH AND WILDLIFE SERVICE; and | |
| THE NATIONAL PARK SERVICE; | |
| Defendants. | |

## INTRODUCTION

1. In approving the Westslope Cutthroat and Bull Trout Preservation in Gunsight Lake Project (the Gunsight Project), the National Park Service had money to spend, and it could not let anything get in the way. *See* News Release, *NPS Approves* [*the Gunsight Project*] (Aug. 4, 2023), Ex. 1. It ignored the science, its policies, and the law.

2. Perched high in the mountains of Glacier National Park, Gunsight Lake historically had no fish because none could swim up waterfalls to reach it. Now, the Park Service has already poisoned the lake to eliminate rainbow trout. It intends to introduce threatened bull trout there as a "refugia" from climate change. But the U.S. Fish and Wildlife Service expects nearby lakes to accomplish that objective.

3. No recovery plan showed any need for the Gunsight Project. Fish and Wildlife repeatedly identified the St. Mary Diversion Dam as the biggest threat to bull trout recovery in the St. Mary watershed. And the Bureau of Reclamation is already tackling that by spending $100 million to rebuild the dam (the Dam Project). It will allow more bull trout to migrate upstream into Glacier to connect populations.

4. The Park Service ignored its own policies. The environmental assessment (the EA) recognizes that humans often harm local native species when they introduce fish to lakes. Yet the Park Service is introducing fish species into habitat where they never lived. Moreover, Park Service policy prohibits introducing fish for sport fishing. And here, it stated it intended to increase sport fishing at Gunsight Lake via the Gunsight Project.

5. Fish and Wildlife arbitrarily and capriciously issued a recovery permit (ES191853) without providing the Federal Register notice that the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544, 1539(c), required. It also arbitrarily and capriciously issued a letter of concurrence without requiring the Park Service to complete ESA consultation over threatened bull trout.

6. The Park Service violated National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4347, in three ways. First, it failed to consider the cumulative effects between the Gunsight Project and the Dam Project. Second, it failed to obtain public comments when it decided to introduce mountain whitefish as a third exotic species in historically fishless Gunsight Lake and change the whole ecology. Third, it failed to take a hard look at how it would collect and propagate bull trout, and the lack of a developed plan precluded meaningful public comment.

7. By following the money instead of the science, policy, and the law, the Park Service and Fish and Wildlife are arbitrarily and capriciously introducing threatened bull trout in Gunsight Lake. Reclamation is addressing the main recovery obstacle with the Dam Project, so the Gunsight Project may not even aid bull trout recovery. The ESA, NEPA, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, compel vacating and remanding the Gunsight Project.

## CAUSES OF ACTION, JURISDICTION, AND VENUE

8. The APA provides a cause of action for all "final agency action[s] for which there is no other adequate remedy in a court . . . ." 5 U.S.C. §§ 702, 704; *Bennett v. Spear*, 520 U.S. 154, 175 (1997). United States Code Title 28, section 1331, assigns this Court jurisdiction over the ESA and NEPA claims brought under the APA

because this case presents a federal question. "[I]t is common ground that if review is proper under the APA, the District Court had jurisdiction under 28 U.S.C. § 1331." *Bowen v. Massachusetts*, 487 U.S. 879, 891 n.16 (1988).

9. The District of Montana provides the proper venue because the Defendants are either U.S. officers or agencies and, on information and belief, Superintendent Roemer lives in West Glacier, Flathead County, within this judicial district. *See* 28 U.S.C. § 1391(e)(1)(A).

## PLAINTIFFS

10. Friends of the Wild Swan have been defending bull trout and their habitat for decades. In 1992, Friends of the Wild Swan and other groups filed the ESA petition that ultimately led Fish and Wildlife to classify bull trout as threatened. Determination of Threatened Status for Bull Trout in the Coterminous U.S., 64 Fed. Reg. 58,910, 58,916 (Nov. 1, 1999). Then, Friends of the Wild Swan sued Fish and Wildlife for failing to designate critical habitat for bull trout, and that lawsuit led to Fish and Wildlife finally designating critical habitat in 2010. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for Bull Trout in the Coterminous U.S., 75 Fed. Reg. 63,898 (Oct. 18, 2010). Due to their involvement in securing listing and critical habitat, Friends of the Wild Swan have felt responsible for overseeing agencies' compliance with the ESA to protect bull trout. They consistently comment on federal and state projects, plans, and policies that impact bull trout in northwest Montana.

11. As a 501(c)(3) charitable nonprofit, Friends of the Wild Swan aim (1) to protect and to improve water quality for people and native fish, (2) to maintain and

to recruit old-growth forest habitat to ensure the viability of old-growth dependent birds and wildlife, and (3) to improve fish and wildlife habitat security by reducing road densities on public lands. Friends of the Wild Swan have consistently used a multi-pronged approach of citizen advocacy. They participate in state and federal agency administrative processes (comments and appeals), complete public education and outreach, use scientific and economic research, and litigate to enforce environmental laws. This approach has produced positive changes in the way federal and state agencies manage aquatic and terrestrial ecosystems on behalf of the public.

12. Plaintiff Council on Wildlife and Fish (the "Council") is also a 501(c)(3) charitable public interest, nonprofit organization. It formed to ensure the maintenance of biological diversity and the ecological integrity of all natural ecosystems through the enforcement and administration of laws such as the Endangered Species Act, National Forest Management Act, National Environmental Policy Act, Clean Water Act, and all other laws that require the recognition, discussion and conservation of such ecosystems and protect the organic or inorganic components that comprise such natural ecosystems. The Council's members are in Montana and enjoy and appreciate indigenous wildlife, fish, spiritual connection and renewal, clean water, and high-quality aquatic and terrestrial habitat. Council members expect to continue these practices well into the future, including in the Gunsight Lake area of Glacier National Park. The Council's members' professional, spiritual, and recreational activities are directly affected by

Defendants' failure to perform their lawful duty to protect and to conserve these ecosystems.

## DEFENDANTS

13. National Park Service Intermountain Regional Director, Katharine Hammond, in her official capacity, oversees the Park Service's Intermountain Region, which includes Glacier National Park. She approved the FONSI.

14. Glacier National Park Superintendent David Roemer, in his official capacity, oversees and directs Glacier National Park. He approved the Gunsight Project's EA, and he recommended the FONSI for approval.

15. Martha Williams, in her official capacity as Director, U.S. Fish and Wildlife Service, oversees Fish and Wildlife.

16. The National Park Service is a component of the Department of the Interior. It is implementing the FONSI.

17. The U.S. Fish and Wildlife Service is a component of the Department of the Interior. The Secretary of the Interior delegated authority to implement the ESA to Fish and Wildlife. 50 C.F.R. § 402.01(b) (2017). It sent a letter of concurrence for the Gunsight Project and issued the ES191853 permit to the Park Service.

## LEGAL BACKGROUND

### I. The ESA ensures federal agencies act within substantive limits to protect threatened and endangered species.

18. In 1973, Congress passed the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (quotations omitted). It directs "all Federal

departments and agencies" to "seek to conserve endangered species and threatened species." 16 U.S.C. § 1531(c)(1). That means using "all methods and procedures which are necessary to bring" those species to the point at which they no longer need protection. *Id.* § 1532(3). The ESA assigns the Secretary of the Interior a duty to "determine whether any species is an endangered species or a threatened species," and to maintain a list. *Id.* § 1533(a)(1), (c)(1); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 691-92 (1995). Congress intended "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184.

19. The ESA prohibits "any person," which includes federal agencies, to "take" any an endangered or threatened species (collectively, "listed species"). 16 U.S.C. §§ 1532(13) (defining person), 1538(a)(1)(B). The ESA uses "the broadest possible terms" to define "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *Babbitt*, 515 U.S. at 704 (quotations omitted). The term "take" "appl[ies] broadly to cover indirect as well as purposeful actions." *Babbitt*, 515 U.S. at 704.

20. The ESA provides narrow exceptions to the prohibitions on taking listed species. If agencies are acting "for scientific purposes or to enhance the propagation or survival of the affected species," the ESA allows Fish and Wildlife to issue a "recovery permit" for those actions. 16 U.S.C. § 1539(a)(1)(A). The ESA requires publishing applications for permits in the Federal Register and allowing public

comment. *Id.* § 1539(c). As another exception, Fish and Wildlife can designate an experimental population to allow different treatment. *Id.* § 1539(j)(2)(A).

21. When no Section 1539 exception applies, the ESA prohibits action agencies from taking listed species unless the taking is "incidental to the agency action" and only then if they complete consultation with Fish and Wildlife (or, in other circumstances than here, the National Marine Fisheries Service). 16 U.S.C. § 1536(a)(4); *Idaho Dep't, Fish v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1073 (9th Cir. 1995). If an "action may affect listed species or critical habitat," and is "likely to adversely affect any listed species or critical habitat," the ESA usually requires the action agency to complete formal consultation. *See* 50 C.F.R. § 402.14(a), (b) (listing exceptions). Formal consultation requires the action agency to issue a biological assessment and Fish and Wildlife to issue a biological opinion, which often includes an incidental take statement. *See* 16 U.S.C. § 1536(b)(4)(B).

## II. NEPA requires agencies to obtain public comment and to analyze cumulative impacts with other reasonably foreseeable projects.

22. In NEPA, Congress declared a policy of using "all practicable means and measures . . . to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a). Congress achieved that purpose "not through substantive mandates but through the creation of a democratic decisionmaking structure that, although strictly procedural, is almost certain to affect the agency's

substantive decision[s]." *Or. Nat. Desert v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099 (9th Cir. 2008).

23. When agencies plan to act, NEPA ensures "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Before taking "major Federal actions" that could irreversibly or irretrievably affect the environment, NEPA requires agencies (1) to analyze the action's reasonably foreseeable environmental consequences and (2) to obtain and to respond to public comment on that analysis. *Id.*; 42 U.S.C. § 4332(C).

24. NEPA requires agencies to analyze cumulative impacts with other reasonably foreseeable projects when their effects together might differ from each project's effects individually. 40 C.F.R. § 1508.1(g)(3) (2022).

25. NEPA also requires agencies to take a "hard look" at environmental impacts and to involve the public in the decision-making process by providing sufficient information to allow "meaningful consideration." *Robertson*, 490 U.S. at 349-350; *California v. Block*, 690 F.2d 753, 770 (9th Cir. 1982). If an agency issues a draft environmental document and if it later considers an action that exceeds the spectrum of alternatives proposed in the draft, NEPA requires the agency to issue a supplemental environmental document to obtain public comment on those new aspects of the decision. *Russell Cntry. Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011) (citing 40 C.F.R. § 1502.9(c) (recodified at section 1502.9(d) (2022)).

26. NEPA requires a "full and fair discussion of significant environmental impacts" that "informs Federal agency decision making and the public." 40 C.F.R. § 1502.1 (2023). It requires agencies to complete that analysis as early as reasonably possible. *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 497 (9th Cir. 2014).

**III. The APA requires courts to take a thorough, probing, in-depth review.**

27. Because NEPA contains no judicial review provision, courts review NEPA decisions under the APA. *see Russell Cntry.*, 668 F.3d at 1041. Courts also review letters of concurrence under the APA. *Friends of River v. Nat'l Marine Fisheries Serv.*, No. 18-15623, at *3 (9th Cir. Oct. 3, 2019).

28. The APA requires agencies to "examine the relevant data," and to "articulate a satisfactory explanation for its action" that includes a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).

29. After agencies make decisions, the APA requires courts to take a "thorough, probing, in-depth review" of agency decisions. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). When agencies act arbitrarily or capriciously, the APA "instructs reviewing courts to set aside [that] agency action . . . ." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019); 5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

30. Instead of remedying the greatest threat to St. Mary bull trout recovery, the Park Service decided to experiment on threatened bull trout—but without Fish and Wildlife designating it an experimental ESA population. *See* 16 U.S.C. § 1539(j).

## I. A dam east of Glacier presents the main obstacle to threatened bull trout recovery in the St. Mary River drainage.

31. In 1999, Fish and Wildlife listed bull trout as threatened everywhere in the coterminous United States. Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for Bull Trout in the Coterminous United States, 64 Fed. Reg. 58,910 (Nov. 1, 1999). Bull trout remain listed.

32. Bull trout are a large char fish native to the northwestern United States and western Canada; they are a top aquatic predator. FONSI 13. Adults range from six to twenty-four inches and can live 12 or more years. Determination of Threatened Status for Bull Trout, 64 Fed. Reg. at 58,911. Juvenile bull trout prey on terrestrial and aquatic insects, macrozooplankton, amphipods, mysids, crayfish, and small fish, and adults feed on various trout and salmon species, whitefish, yellow perch, and sculpin. *Id.* East of the Continental Divide in the United States, bull trout live only in the St. Mary River drainage. FONSI 2, 13.

33. In 2020, Fish and Wildlife identified the main obstacle to bull trout recovery in the St. Mary recovery unit as "water diversions, specifically at the Bureau of Reclamations Milk River Project." Programmatic Biological Opinion, Bull Trout [ESA] Section 6(d) Traditional Grants to States and Section 10(a)(1)(A) Recovery Permits for Idaho, Mont., Nev., Or., and Wash. 41 (Feb. 24, 2020) (citation omitted). In 2005, Fish and Wildlife identified four actions that would benefit bull trout in the St. Mary River drainage. Three of them involved (1) modifying the St. Mary Diversion Dam to help bull trout migrate, (2) preventing the dam from pulling bull trout through dam mechanisms (entrainment), and (3) assessing the water

diversion into the St. Mary Canal. Bull Trout (Salvelinus Confluentus) in the St. Mary River Drainage 2. The Dam Project accomplishes these three objectives, but the Gunsight Project accomplishes none of them.

## II. The Dam Project

34. Reclamation built several structures in the St. Mary River basin between 1906 and 1924 to help irrigate the Milk River basin in northcentral Montana via the St. Mary Canal. Dam Project Draft EA 3 (Dam EA). The harsh winter conditions and spring conditions are causing the existing facilities to disintegrate. *Id.* "Floating trees, stumps, and debris hang up on the dam crest and piers, block the sluiceways, and often prevent the closure of gates." *Id.* Unfortunately, the patchwork of repairs failed to stop this year's catastrophic failure of the St. Mary River Siphon that shut down the canal. Amanda Eggert, *Updated: 'Catastrophic' failure of St. Mary siphons leads to localized flooding in Babb*, Mont. Free Press (June 17, 2024), Ex. 2.

35. The Dam also stops bull trout from passing upstream, and bull trout get caught in the Dam's operating mechanisms. Dam EA 5. The 2021 Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 §§ 40901, 40904(b) (Nov. 15, 2021), included $100 million for addressing the Dam and related infrastructure. *See* Dam FONSI 2. With the Dam Project, Reclamation will replace the existing infrastructure with "modern structures" that will maintain the functionality of the existing system while "provid[ing[ fish passage at the St. Mary Diversion Dam, and prevent[ing] fish entrainment in the St. Mary Canal." Dam EA 9.

36. The new dam would provide bull trout "a more-natural, channel-like connection to upstream habitats." It will substantially improve the likelihood that

Pls.' Compl.

adult bull trout could migrate upstream and spawn . . . ." Dam EA 45. It would allow "both upstream and downstream passage and promote connectivity between habitat types and subpopulations" of fish. *Id.* Although the five-year construction would increase barriers to fish passage, and increase turbidity, the Dam Project would benefit "bull trout and other native fish species that occupy the St. Mary River drainage." *Id.* at 44-45.

## III. The Gunsight Project

37. The Park Service designed a purpose and need contrary to its policies and unnecessary for bull trout recovery. Historically, no fish lived in Gunsight Lake. EA 1. In 1916, someone (likely, either the Park Service or Fish and Wildlife) stocked it with non-native cutthroat trout. *Id.* Over the next twenty years, the Park Service or Fish and Wildlife (likely) stocked it with about 224,000 rainbow trout. "The rainbow trout established a self-sustaining population and are currently the only fish species present at the lake . . . ." EA 1. No bull trout live there. *Id.* Downstream waterfalls "are barriers to upstream fish migration." *Id.*

38. The Park Service knows humans usually harm local native species when introducing fish to lakes where those species never lived. "The history of non-native fish stocking across the western US is fraught with examples of well-intended introductions of non-native fish species that have resulted in major negative impacts to local native species." *Id.* at D-2. The Park Service is making that mistake again.

39. The Park Service intends to create, in Gunsight Lake, a "refugia" to create a habitat "secure from the threats of hybridization and climate change." FONSI 2. It

explains that climate change is already causing drastic impacts on species across the globe and bull trout need cold water. EA 1. But Fish and Wildlife recently saw no need for more bull trout refugia. "The lakes themselves provide cold water refugia and a measure of resiliency from minor temperature effects." Fish and Wildlife, St. Mary Recovery Unit Implementation Plan for Bull Trout F-6 (Sept. 2015). Fish and Wildlife identified the four Cs that bull trout need: "Cold, Clean, Complex, and Connected habitat." Recovery Plan for the Coterminous United States Population of Bull Trout 4-5 (Sept. 28, 2015). Instead of creating connected habitat, the Gunsight Project will *dis*connect this population because no bull trout will be able to swim up the waterfalls to Gunsight Lake.

40. In addition to ignoring the science, the Park Service is ignoring its own policy. Its policy states, "[t]he National Park Service no longer stocks fish in park waters to enhance sport fishing." Glacier National Park, *Fishing, at* nps.gov/glac/planyourvisit/fishing.htm. Yet in the Gunsight Project EA, it declared it was intending to introduce westslope cutthroat trout in Gunsight Lake to create a new lake for fishing for westslope cutthroat trout. EA 2.

A. <u>The Gunsight Project will take threatened bull trout.</u>

41. The Gunsight Project will "take" several populations of ESA-listed bull trout in two main categories. First, it will take bull trout in the donor streams from which the Park Service will propagate more bull trout. Second, it will take bull trout in Gunsight Lake by creating a whole new population disconnected genetically from any breeding with bull trout that would swim up the waterfalls.

42. In only one sentence, the FONSI sought to explain how it could take so many bull trout, yet comply with the ESA. The Park Service claimed it had a broad permit allows its actions. Programmatic Intra-Service Consultation, TAILS No. 01EOFW00-2020-F-0082 (cited by FONSI 12). Only later did Fish and Wildlife issue the sub-permit, the ES191853 permit, upon which the Park Service is now relying.

43. Fish and Wildlife never published the application in the Federal Register or allowed public comment. It never considered alternatives for the permit, and it failed to complete the analysis the ESA regulation requires. 50 C.F.R. § 17.32(a), (b). Moreover, because the Park Service put the cart before the horse and issued the FONSI before Fish and Wildlife issued the ES191853 permit, the FONSI calls for actions the permit does not authorize.

B. <u>The Park Service never analyzed how the Gunsight Project and the Dam Project, together, would affect bull trout.</u>

44. Friends of the Wild Swan and the Council on Wildlife and Fish (collectively, Friends) pointed out in their NEPA comment letter that the Dam Project will "mitigate[] the negative effects of the irrigation systems outside the park without tinkering with the existing strong bull trout populations in the Park, poisoning Gunsight Lake and the St. Mary River, and trammeling the wilderness nature of the Park." The Park Service never analyzed how the two projects, together, could affect bull trout. Instead, the Park Service "shunted aside" that consideration "in the bureaucratic shuffle." *See Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 787 (1976). It declined to consider the Dam Project because the construction had not started. FONSI, App'x C, Errata 23.

C. <u>The Park Service never allowed public comment on introducing mountain whitefish to Gunsight Lake.</u>

45. After the public comment period, the Park Service decided to add a whole new species to Gunsight Lake. FONSI 3. Adding mountain whitefish creates an entirely different ecology. The EA only mentions mountain whitefish once—in passing among a list of other fish. At E-1. In the FONSI, the Park Service rewrote dozens of sections of the EA to include mountain whitefish. No commenter could have foreseen that sharp turn that the Park Service took from *two* species to *three* species. This change far exceeds the spectrum of alternatives the Park Service presented to the public.

46. Adding mountain whitefish creates all manner of unexpected impacts. Gunsight Lake may not have sufficient capacity to accommodate three genetically diverse species. Mountain whitefish might eat insects that bird species or amphibian species would otherwise eat, so they may disrupt the food web. Public comments could have pointed out gaps in that new analysis before the Park Service approved the Gunsight Project. Now, the public has no more options to comment.

D. <u>The EA failed to explain the reasonably foreseeable details of Stage 2.</u>

47. The Park Service failed to take a hard look at Stage 2 or to present sufficient information for the public to comment on it. The EA describes two project "stages." Stage 1 describes how the Park Service will poison Gunsight Lake. At 4-7. Stage 2 states the Park Service plans to collect "individual trout or trout gametes from donor streams inside and outside" Glacier, to "propagat[e] the fish in a hatchery outside the park," and to "stock[] them in Gunsight Lake and/or directly moving the

fish to the lake without hatchery propagation." EA 8. But that is not a plan; that is a plan to have a plan. The Park Service admits it will plan Stage 2 later: "[a] site-specific plan for collecting bull trout gametes from the St. Mary drainage would be created in consultation with [Fish and Wildlife]." EA, App'x B, B-1. Consequently, the EA fails to answer reasonably foreseeable, key questions on the number of bull trout it will take from donor streams, the particular streams from where it will take them, at what hatchery it will propagate them, or how many bull trout it will introduce into Gunsight Lake. It failed to take a hard look to comply with NEPA.

### COUNT 1: ESA AND APA VIOLATION

48. Friends adopt the previous paragraphs by reference.

49. Fish and Wildlife violated the ESA and the APA by arbitrarily and capriciously approving the ES191853 permit without publishing the application in the Federal Register. *See* 16 U.S.C. § 1539(c). It issued the permit without observance of procedure required by law. *See* 5 U.S.C. 706(2)(D).

50. The applicable regulation further specifies the contents of the application. 50 C.F.R. § 17.32(b). It requires the applicant to propose alternatives and to explain why it is not undertaking those alternatives. 50 C.F.R. § 17.32(b)(x). It requires the permit applicant to provide "photographs or diagrams, of the facilities to house and/or care for the wildlife . . . ." *Id.* § 17.32(a)(1)(vi). The permit reveals no analysis of alternatives or photographs or diagrams of any facilities.

51. The regulation also requires Fish and Wildlife to make particular findings for any permit. *Id.* § 17.32(a)(2). Fish and Wildlife did not make those findings for permit ES191853. It acted arbitrarily and capriciously by failing to consider the

relevant considerations to reach that conclusion. *State Farm*, 463 U.S. at 43. Fish and Wildlife violated the ESA and the APA by approving permit ES191853.

52. Even if the permit were valid, the Gunsight Project activities exceed the permit's scope. That results in the Gunsight Project activities taking bull trout.

53. Fish and Wildlife's letter of concurrence arbitrarily and capriciously fails to recognize the project would take bull trout. No exception applies. It put the cart before the horse by sending the letter of concurrence although the FONSI requires actions that the later permit does not authorize. Fish and Wildlife did not create an experimental population of bull trout at Gunsight Lake under Section 1539(j). Therefore, the ESA required the Park Service to complete consultation for the Gunsight Project's taking of threatened bull trout.

54. Fish and Wildlife could have declined to issue a letter of concurrence until the Park Service completed consultation on bull trout. Instead, it violated the ESA and the APA by issuing a letter of concurrence that approved the Gunsight Project.

## COUNT 2: NEPA AND APA VIOLATIONS

55. Friends adopt the previous paragraphs by reference.

56. The Park Service violated NEPA and the APA by arbitrarily and capriciously approving the Gunsight Project and issuing the FONSI.

57. First, the Park Service failed to consider the cumulative impacts on bull trout from the Dam Project. The Dam Project fatally undermines the need for the Gunsight Project, and the Gunsight Project may have no incremental, cumulative benefit for bull trout recovery. The Park Service is experimenting. The Park Service declined to analyze the two projects' cumulative effects because Dam Project

construction had not started. FONSI, App'x C, Errata 23. It applied the wrong standard under NEPA. NEPA requires analyzing cumulative effects of reasonably foreseeable projects. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002) (overturning an agency for failing to analyze cumulative impacts). The FONSI admits the Dam Project was going forward, so it qualifies as reasonably foreseeable. *See id*. But the Park Service violated NEPA by failing to analyze the cumulative effects between the Gunsight Project and the Dam Project.

58. Second, the Park Service violated NEPA by failing to issue a supplemental environmental assessment when it drastically changed the project from introducing *two* species into Gunsight Lake into introducing *three* species. None of those species have ever lived in Gunsight Lake, and adding mountain whitefish takes this decision far outside the spectrum of alternatives the EA presented for public comment. That substantial change in the Gunsight Project creates a significantly different ecosystem with different carrying capacities and different interactions among fish. It requires a delicate balance of each of the three fish to ensure viable populations of all three, and the Park Service failed to give the public an opportunity to comment on that substantial—and indeed drastic—change. NEPA required the Park Service to allow the public to provide input on that substantial change. The Park Service violated NEPA by failing to issue a supplemental environmental impact statement before issuing the FONSI.

59. Third, removing bull trout from small donor lakes would commit resources irreversibly and irretrievably without taking a hard look at the consequences.

NEPA requires the Park Service to disclose to the public the Gunsight Project's reasonably foreseeable details. But the Park Service omitted all of the relevant details of Stage 2, under which it will collect bull trout, propagate them, and create a whole new ecology in Gunsight Lake. The Park Service failed to identify (a) how many bull trout it intended to take, (b) the minimum number of bull trout necessary to establish a genetically viable population in Gunsight Lake, (c) how many bull trout it would take from each stream, (d) where it intends to spawn them, and (e) whether those hatcheries have sufficient capacity for spawning and breeding.

60. To maintain genetic diversity the Park would likely have to capture and spawn hundreds of pairs of bull trout. The EA does not determine whether the streams it identifies have sufficient populations to complete Stage 2. It failed to analyze the effects of trapping, holding, and spawning bull trout on the spawning adults (they spawn for multiple years). Hatchery produced salmonid fishes (trout, char, salmon, etc.) typically have no more than half the reproductive success of wild-born fish. And when hatchery-spawned fish spawn with wild-born fish, they decrease the productivity (fitness) of native populations. Ultimately, Creston Fish Hatchery may lack capacity to hold and culture sufficient numbers of bull trout.

61. The Park is creating an artificial "resident" population of bull trout isolated by waterfalls that risks inbreeding and environmental events that could wipe out the entire population. The Park Service will introduce bull trout that did not evolve or genetically adapt to that stream and river environment. The Gunsight Project does not effectively preserve bull trout or contribute to recovery. The Park Service

never analyzed these effects or disclosed them in the EA. The Park Service failed to take a hard look at Gunsight Project's Stage 2 environmental impacts.

62. For these reasons, the Park Service also violated NEPA and the APA.

## PRAYER FOR RELIEF

63. Friends request the Court to issue the following relief:

a. Declare the Gunsight Project violates the ESA by taking bull trout;

b. Enjoin the Park Service from implementing the FONSI;

c. Declare the FONSI arbitrary and capricious in violation of NEPA and the APA,

d. Vacate, set aside, and remand the FONSI to the Park Service;

e. Declare Fish and Wildlife's Letter of Concurrence arbitrary and capricious in violation of the ESA and the APA;

f. Vacate, set aside, and remand the letter of concurrence;

g. Order the Park Service and Fish and Wildlife to pay Friends their reasonable attorneys' fees and costs; and

h. Provide necessary or appropriate further relief.

Dated September 16, 2024,

_/s/ Jared S. Pettinato_
JARED S. PETTINATO
The Pettinato Firm
1802 Vernon St. NW, PMB 620
Washington, DC 20009
(406) 314-3247
Jared@JaredPettinato.com
*Attorneys for Plaintiffs*
*Friends of the Wild Swan and*
*Council on Wildlife and Fish*