UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN and COUNCIL ON WILDLIFE AND FISH, | |
| Plaintiffs, | CV 24–128–M–DLC |
| v. | ORDER |
| BRIAN CARLSTROM, exercising the delegated authority of Intermountain Regional Director, National Park Service, *et al.*,[1] | |
| Defendants. | |

Before the Court is Plaintiffs Friends of the Wild Swan and Council for Wildlife and Fish's ("Friends") Motion for Attorney Fees and Costs. (Doc. 27.) Friends seek attorney fees and costs in the amount of $26,253 pursuant to the Endangered Species Act ("ESA"), or alternatively, the Equal Access to Justice Act ("EAJA"). (Doc. 30 at 3.) For the reasons herein, the Motion will be granted and the full fee amount awarded.

---

[1] Brian Carlstrom is substituted for Kate Hammond pursuant to Fed. R. Civ. P. 25(d).

1

**FACTUAL AND PROCEDURAL BACKGROUND**

Friends filed this lawsuit in September 2024 against the United States Fish and Wildlife Service ("FWS") and the National Park Service ("NPS") (collectively, the "Agencies") for alleged violations under the ESA, the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA") related to the Gunsight Lake Project (the "Project"). (Doc. 1.) Although NPS had completed the first phase of the Project, it had yet to begin phase two, which entailed the translocation of mountain whitefish, westslope cutthroat trout, and bull trout into Gunsight Lake within Glacier National Park. (Doc. 17 at 2.) Friends initially notified the Agencies of their concerns regarding the Project in 2023 and sent comments on the Project's Environmental Assessment ("EA"). (Doc. 27-4.) Thereafter, when Friends discovered NPS had issued the Finding of No Significant Impact "FONSI," they informally requested the Project documents for review; NPS denied that request, relaying that it would not produce the documents except in response to a Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, request. (Doc. 27-5 ¶¶ 10.) Friends submitted the FOIA request, but it apparently "fell through the cracks" until Friends filed a separate lawsuit to obtain the requested documents. (*Id.* ¶ 11); *Friends v. Roemer*, No.1:24-cv-398 (D.D.C. Feb. 9, 2024).

Upon receipt of the FOIA documents, Friends identified more specific flaws in the Agencies' analysis and sent two sixty-day notices, the first in July 2025. (Doc. 27-1 at 13–14 (citing Docs. 27-8; 27-9).) In response to the first notice, the Agencies indicated that they intended to proceed with the Project; the Agencies did not respond to the second notice. (*Id.* at 14.)

Friends thereafter filed this lawsuit, alleging that due to the isolated nature of Gunsight Lake, the Project risked inbreeding and environmental events that could wipe out the entire resident population of bull trout. (Doc. 65.) Friends brought three claims for relief against the Agencies: (1) that FWS's issuance of the Letter of Concurrence violated the ESA, and such action was arbitrary and capricious; (2) that NPS's "FONSI" authorized action constituting a "take" of threatened bull trout in violation of the ESA, without any permit authorizing such a take; and (3) that NPS violated NEPA by issuing the FONSI. (*See* Doc. 12 ¶¶ 50–66.) Friends sought declaratory and injunctive relief with vacatur. (*Id.* at 22–23.) This matter was stayed on December 17, 2024. (Doc. 14.)

After four months of settlement discussions, the Agencies moved to remand NPS's FONSI and FWS's June 7, 2023, Letter of Concurrence without vacatur due to "substantial concerns with the environmental analysis underlying the Project." (Doc. 17.) Specifically, the Agencies identified the following deficiencies:

(1) The EA's analysis of the environmental effects of the second stage of the Gunsight Lake Project lacks sufficient discussion of the impacts of Project activities on bull trout;

(2) The NPS relied on a Programmatic Biological Opinion that lacks sufficient consideration of effects to bull trout from Gunsight Lake Project activities; and

(3) Permit ES191853-1 does not adequately cover activities conducted under the Gunsight Lake Project.

(Doc. 17-2 ¶ 4.) The Agencies sought remand to allow NPS to review the NEPA analysis and ESA Section 7 Consultation for the Project. (*Id.* ¶ 5.) This Court remanded the matter back to the Agencies on April 9, 2025, without vacatur (Doc. 18), and the present Motion followed after additional negotiations regarding attorney fees were unsuccessful (Doc. 27).

## LEGAL STANDARD

Friends seek reimbursement through the citizen-suit provision of the ESA or, alternatively, the EAJA, 28 U.S.C. § 2412. (Doc. 27-1 at 7.) The citizen-suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A), allows a court to "award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 16 U.S.C. § 1540(g)(4). The reasonableness standard set forth in *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), governs the fee-shifting provisions of both the ESA and EAJA. The party

moving for attorney fees bears the burden of persuasion under both the ESA and the EAJA. *Id.* at 437.

Attorney fee awards are calculated first using the lodestar method, wherein a reasonable hourly rate of compensation is multiplied by the number of hours reasonably expended on the litigation. *See Blum v. Stenson*, 465 U.S. 886 (1984). District courts are tasked with determining the amount of fees that are "reasonable," *Hensley*, 461 U.S. at 433, and it is within a court's discretion to reduce an award for attorney fees by up to ten percent without offering a specific explanation for the reduction, *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). A court may further reduce an award amount if a movant's supporting documents are inadequate or include hours not "reasonably expended," such as "hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 433–34. A full fee award can be "excessive" if a plaintiff has achieved only limited or partial success on their claims. *Id.* at 436. "This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Id.*

## DISCUSSION

Friends seek $26,253 in attorney fees and costs, arguing they are entitled to both because this action was the catalyst for the Agencies' decision to seek

remand. (Docs. 30 at 15; 27-1 at 22.) In response, Defendants urge this Court to reduce fees based upon Plaintiffs' limited success on the merits and their allegedly excessive and inappropriate billing practices. (Doc. 29 at 7, 11.)

## I.     ESA Fee Award

In 1973, Congress passed the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It directs "all Federal departments and agencies" to "seek to conserve endangered species and threatened species." *Id.* As part of its many provisions, the ESA prohibits "any person," including federal agencies, from causing a take of any endangered or threatened species. 16 U.S.C. §§ 1532(13), 1538(a)(1)(B); *see also* § 1532(19) (definition of "take"). Congress specifically allows citizen-suits to prevent the take of endangered or threatened species.

Fee awards under the ESA are "appropriate" if the lawsuit acted as a catalyst and "brought about a voluntary change in the defendant's conduct." *Ass'n of Cal. Water Agencies v. Evans*, 386 F.3d 879, 881, 884–85 (9th Cir. 2004) (quotations omitted). "When a plaintiff does not win a final judgment on the merits, it may nonetheless be entitled to fees under the ESA if it can satisfy a two-part test: First, the plaintiff must have received some of the benefits sought in the suit, and there

must be a 'clear, causal relationship' between the litigation brought and the practical outcome realized." *All. for the Wild Rockies, Inc. v. U.S. Army Corps of Eng'rs*, 736 F. App'x 160, 160 (9th Cir. 2018) (citation omitted). "Second, the court must determine whether 'the benefit achieved was required by law and was not a gratuitous act of the defendant.'" *Id.* (citation omitted).

In the Court's view, Friends clearly achieved "some of the benefits sought" by their Amended Complaint. Although the Amended Complaint sought declaratory and injunctive relief, it also sought remand of the FONSI and Letter of Concurrence—both of which were ordered by the Court following Defendants' Unopposed Motion to Remand. (Docs. 17; 18.) It is also apparent that Defendants sought remand as a direct result of—or at the very least in part due to—this litigation. Indeed, despite Friends' first 60-day notice letter, Defendants had no intention of halting the Project as of August 2024. (*See* Doc. 27-8.) Only after Friends transmitted a second 60-day notice and filed the original Complaint did the Agencies engage in the settlement negotiations that eventually resulted in the April 9, 2025, Motion to Remand. (*See* Docs. 27-8; 12; 13; 17.) Friends have therefore satisfied the first component of the analysis outlined by *Alliance for the Wild Rockies*.

7

Turning now to the second consideration, the Court finds that the Agencies'

declaration in support of remand demonstrates that this was required by law. "The

basic rule here is clear: An agency must defend its actions based on the reasons it

gave when it acted." *Dep't of Homeland Sec'y v. Regents of Univ.*, 591 U.S. 1, 24

(2020). Here, the Agencies sought remand because they had "substantial concerns"

with (1) the analysis of the environmental effects of the second stage of the Project

under NEPA, (2) the adequacy of the Project's ESA Section 7 Consultation, and

(3) the adequacy of Permit ES191853-1 to cover Project activities. (Doc. 17-2 ¶ 3.)

The Agencies further conceded that, in order to ensure compliance with the

relevant statutes, NPS must withdraw the FONSI and biological assessment for the

Project to allow time for additional review. (*Id.* ¶ 5.)

In consideration of the above, the Court finds that Friends' lawsuit played a

critical part in Defendants' decision to remand the Project, and as a result of the

remand, Friends "received some of the benefits they sought in the suit" and there

was "some sort of causal relationship between the litigation brought and the

outcome realized." *Ass'n of California Water Agencies*, 386 F.3d at 886–87

(citation omitted). Therefore, because Friends are entitled to fees under the ESA,

16 U.S.C. § 1540(g)(4), the Court need not address fee allotment under the EAJA.

8

In response, Defendants do not contest Friends' catalyst theory argument, but urge this Court to reduce fees based upon Friends' "limited success" and because their ESA claim "was not yet ripe for judicial review." (Doc. 29 at 7, 13.) Yet Friends' eligibility for a fee award derives not from a decision on the merits—wherein the Court would generally look to the level of success achieved—but from the fact that Friends' suit was the "catalyst" for the change rendered. Indeed, although the Supreme Court's decision in *Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of Health*, 532 U.S. 598 (2001), "preclude[s] use of the catalyst theory for suits brought under statutes providing fee shifting for a 'prevailing party,' the decision does not preclude use of the catalyst theory for suits brought under statutes like the ESA," which permits an award "whenever the court determines such award is appropriate." *Ass'n of California Water Agencies*, 386 F.3d at 885. Defendants are thus focused on the wrong legal metric. "The result is what matters," *Hensley*, 461 U.S. at 435, and Friends received "meaningful relief" by "correct[ing] a violation of federal law[,]" *Fox v. Vice*, 563 U.S. 826, 834 (2011); *see also All. for the Wild Rockies, Inc.*, 736 F. App'x at 160 ("plaintiff must have received some of the benefits sought in the suit, and there must be a 'clear, causal relationship' between the litigation brought and the practical outcome realized").

Moreover, under *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), a claim arising from an administrative decision is ripe for adjudication if (1) the issues are fit for judicial decision, and (2) withholding court consideration would cause hardship to the parties. Here, Friends' ESA citizen-suit claim is ripe because NPS's decision had been "formalized and its effects were felt in a concrete way." *Abbott Laboratories*, 387 U.S. at 149. Specifically, NPS had issued a final decision authorizing the "spawning or hatching and raising" of bull trout as early as 2025 and planning to "introduce . . . two to four-year classes of bull trout" into Gunsight Lake as early as 2027—the result of which left Friends no adequate alternative but to seek review before the irreversible harm occurred. (*See* Doc. 12 ¶ 57); *Abbott Labs.*, 387 U.S. at 149, 153. In any event, the Ninth Circuit does not require that a plaintiff wait to bring a citizen-suit claim until after the harm has occurred. *See Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783, 785 (9th Cir. 1995) ("a showing of a future injury to an endangered or threatened species is actionable under the ESA.").

## II.    The Reasonableness of the Fee Request

To determine the fee amount, the court begins with a "lodestar calculation" by multiplying the "hours reasonably spent on the case times [a] reasonable hourly rate." *Gisbrecht v. Barnhart*, 535 U.S. 789, 792, 802 (2002). "There is a strong

presumption that the lodestar represents the reasonable fee." *United States v. $28,000.00 in U.S. Currency*, 802 F.3d 1100, 1108 (9th Cir. 2015) (quotations omitted).

Here, Friends seek $549 in hard costs for filing, printing, and mailing (Docs. 27-12; 27-13; 27-14; 27-15) and $25,704 in attorney fees (Docs. 27-12; 30 at 3) for a total of $26,253. The attorney fee request represents 71.4 hours spent litigating at a rate of $360 per hour for Mr. Jared S. Pettinato. (Docs. 27-12; 30 at 14–15.) Defendants argue that the Court should not award fees based upon Friends' allegedly excessive and improper billing practices. (Doc. 29 at 11.) The Court disagrees.

## A. Hourly Rate

In determining a reasonable hourly rate, the Court should consider the prevailing rate in the relevant legal community for similar work performed by attorneys of comparable skill, experience, and reputation. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210–11 (9th Cir. 1986); *see also All. for the Wild Rockies v. U.S. Dep't of Agric.*, 2016 WL 4766234, at *7 (D. Mont. Sept. 13, 2016) (defining the "relevant legal community" as "environmental attorneys in Montana with commensurate experience, reputation, and skill").

11

In the instant Motion, Mr. Pettinato requests reimbursement for an hourly rate of $360. (Doc. 27-1 at 33.) Mr. Pettinato argues this rate is reasonable in light of his skill, training, and experience, and is conservative because he maintains his law practice in Washington, D.C., and not Montana. (*Id.*) Mr. Pettinato has 20 years of litigation experience spanning both the private and public sectors. (Doc. 27-11 ¶¶ 8–9, 10.) He has litigated dozens of environmental law cases, many in Montana. (*Id.* ¶¶ 13, 16.)

Mr. Pettinato's rate falls well within what this Court views as reasonable. For example, in 2023, this Court granted an attorney of similar training and experience $390 per hour for work expended in an environmental case. *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 2023 WL 6992817, at *4 (D. Mont. Oct. 23, 2023). Moreover, there is a well-documented upward trend in the rate requests of seasoned environmental attorneys such as Mr. Pettinato. *See Native Ecosystems Council v. Krueger*, 2019 WL 1489839, at *5 (D. Mont. Apr. 4, 2019) (recognizing $340 per hour as reasonable in 2018); *All. for the Wild Rockies v. Savage*, 2019 WL 3293425, at *6–7 (D. Mont. July 22, 2019) (recognizing $350 per hour as reasonable for environmental attorney in 2019). Mr. Pettinato has years of experience in the field of environmental law and, as just indicated, his fee request is commensurate with environmental attorneys in

Montana with similar experience, reputation, and skill. Therefore, a rate of $360 is more than reasonable for an attorney of Mr. Pettinato's experience, background, and skillset. (*See* Doc. 27-11 ¶ 13) (listing cases).

### B.  Reasonableness of Hours Spent

"The number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). The Court may reduce the number of hours awarded if it finds that the attorney performed unnecessary, duplicative, or otherwise unreasonable work. *Id.* at 1112. Here, Mr. Pettinato reports spending 71.4 hours litigating this case. (Doc. 24-12 at 6.)[2] These hours were recorded contemporaneously and with detailed descriptions of the work provided. (*See id.*) Mr. Pettinato removed time related to "media, administrative efforts, duplicative billing, and other time [he] would not bill to a private client." (Doc. 27-11 ¶ 20.)

Defendants argue that the Court should not award fees for excessive, inappropriate billing practices. (Doc. 29 at 11.) Defendants contend that Friends' timesheets include entries that appear to be excessive, repetitive, or otherwise

---

[2] This number accounts for the 3 hours Plaintiffs withdrew in their Reply Brief. (*See* Doc. 30 at 15.)

unreasonable, taking specific issue with Friends' five entries for pre-complaint research in 2024, adjustments made in response to client comments, and clerical tasks. (Doc. 29 at 11–12.)

Upon review, the Court does not find Mr. Pettinato's entries unreasonable, and Defendants have failed to identify a "rare circumstance" warranting a deviation from the lodestar figure. *See Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006). Because Defendants have failed to overcome the presumption in favor of the loadstar figure, the analysis may end here. *See id.*

A review of the invoices, however, leads to the same result. First, Friends' prelitigation work was necessary and efficient. Cases are decided, the law changes, statutes are promulgated and amended. A lawyer, therefore, "needs to get up to speed with research previously performed. All this is duplication, of course, but it's necessary duplication; it is inherent in the process of litigating over time." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). Because Friends possessed most of the administrative record due to their FOIA request, 47 hours of prelitigation work is more than reasonable. (*See* Doc. 27-12 at 2–4.)

Furthermore, although Defendants argue that Friends billed for seven clerical tasks, they cite to three pages of the invoice without actually identifying any specific clerical time. This Court need not search through the record to justify

Defendants' argument. *See Foskaris v. Experian Info. Sols., Inc.*, 808 F. App'x 436, 440 (9th Cir. 2020) ("It is not the court's duty [] to peruse the record to formulate the parties' arguments.") At any rate, "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox*, 563 U.S. at 838. Finally, the invoice covers the settlement and client discussions necessary for the expeditious outcome achieved here; it is the Court's opinion that Friends' straightforward claims expedited the resolution of this matter, and the fee request is modest given the results.

Therefore, because the time could reasonably have been billed to a private client, and because there are no special circumstances warranting a deviation from the lodestar figure, the Court concludes that Mr. Pettinato spent a reasonable number of hours litigating this matter.

## C. Costs

Friends seek $549 for the filing fee in this case and for printing and postage related to service of process. (Doc. 27-12 at 7.) Recovery of "costs of litigation" is authorized by the ESA, 16 U.S.C. § 1540(g)(4). It does not appear that Defendants oppose the award of these costs. (*See* Doc. 29 at 10.) Therefore, the Court will award Friends the full amount requested.

15

## III.   Fees on Fees

Finally, Friends seek attorney fees related to litigating the present Motion. (Doc. 27-1 at 37.) The Court has discretion to award fees on fees, and finds such an award appropriate in this instance. *Crow Indian Tribe v. United States*, 2021 WL 3142155, at *10 (D. Mont. 2021) (citing *Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir. 1986)). Because Friends is not yet aware of the total time spent litigating this Motion, Plaintiffs offer to seek settlement with the Agencies for fees on fees before returning to this Court. (Doc. 27-1 at 38.)

### CONCLUSION

Accordingly, for the reasons stated above,

IT IS ORDERED that the Motion for Attorney's Fees and Costs (Doc. 27) is GRANTED. Defendants are liable to Plaintiffs in the amount of $26,253 in attorney fees and costs.

IT IS FURTHER ORDERED that Defendants are liable to Plaintiffs for fees related to litigating the present Motion. In the event the parties cannot reach an agreement, Plaintiffs shall file a renewed motion seeking such amount.

DATED this 10th day of March, 2026.

_____
Dana L. Christensen, District Judge
United States District Court